# VIRGINIA:

*In the Court of Appeals of Virginia on* **Tuesday** *the* **16th** *day of* **April, 2024**.

Elwood Lewis Thomas,                                                                    Appellant,

 against          Record No. 1429-22-4
                 Circuit Court Nos. FE-2020-515, FE-2021-37 and FE-2021-38

Commonwealth of Virginia,                                                              Appellee.


Upon a Petition for Rehearing En Banc

Before the Full Court


On March 26, 2024, the appellee, by the Attorney General of Virginia, filed a petition requesting that the Court set aside the judgment rendered on March 12, 2023, and grant a rehearing en banc on the issue(s) raised in the petition.

On consideration whereof and pursuant to Rule 5A:35 of the Rules of the Supreme Court of Virginia, the Court grants the petition for rehearing en banc and reinstates the appeal of those issues on the docket. The Court stays the mandate previously entered in this case pending the Court's en banc decision.

The parties must file briefs in compliance with the schedule set forth in Rule 5A:35(b).


A Copy,

Teste:

A. John Vollino, Clerk

By:     *original order signed by a deputy clerk of the*
        *Court of Appeals of Virginia at the direction*
        *of the Court*

Deputy Clerk

COURT OF APPEALS OF VIRGINIA

Present:   Judges Causey, Raphael and Senior Judge Clements
Argued at Richmond, Virginia

UNPUBLISHED

ELWOOD LEWIS THOMAS

                                                      MEMORANDUM OPINION[*] BY
v.        Record No. 1429-22-4                   JUDGE JEAN HARRISON CLEMENTS
                                                           MARCH 12, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Grace Burke Carroll,[1] Judge

Bryan Kennedy, Senior Assistant Public Defender (Jessica Newton,
Assistant Public Defender, on briefs), for appellant.

Collin C. Crookenden, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

A jury convicted Elwood Lewis Thomas of two counts of rape, two counts of animate object

sexual penetration, and two counts of aggravated sexual battery committed against A.R.  *See* Circuit

Court No. FE-2021-37.  Subsequently, Thomas pleaded guilty to two unrelated counts of

aggravated sexual battery for crimes against two other victims.  *See* Circuit Court Nos.

FE-2020-515; FE-2021-38.  The trial court sentenced Thomas in all three cases at a joint sentencing

hearing.

Thomas challenges his jury convictions on three grounds.  First, he argues that the trial court

erred by denying his motion to suppress incriminating statements he made to law enforcement

during a custodial interrogation.  Second, he argues that the trial court violated his due process right

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] Judge David Bernhard presided over Thomas's suppression motion.  Judge Stephen C.
Shannon considered Thomas's pretrial motion to exclude the Commonwealth's expert.  Judge
Grace Burke Carroll presided over the trial and sentencing.

to present a defense by excluding his mother's testimony about facts that he contends would have shown those incriminating statements were false. Third, he argues that the trial court abused its discretion by allowing the Commonwealth to present expert testimony about delayed reporting and memory formation in child victims. Thomas also challenges his sentences in all cases on the ground that the trial court did not properly consider his mitigating evidence. We agree with Thomas that the trial court erred by not suppressing his incriminating statements. Accordingly, we reverse his jury convictions and remand for further proceedings. But we affirm Thomas's sentences for the aggravated sexual battery convictions arising from his guilty pleas.

## BACKGROUND

We recite the facts "in the 'light most favorable' to the Commonwealth, the prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022) (quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)). Doing so requires us to "discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018)).

Thomas's grandmother operated a daycare at her house, where Thomas also lived. A.R. attended that daycare from 2008 to 2012, when she was between 4 and 8 years old and Thomas was between 24 and 28 years old.

Thomas "raped [A.R.] multiple times" at the daycare. On one occasion, he carried her downstairs, removed her pants, and put his penis in her vagina. A.R. testified that Thomas put his penis in her vagina "more than 20 times" from 2008 to 2012 but could not remember exactly how often he had done so. Thomas also inserted his finger into A.R.'s vagina on numerous occasions. A.R. described two such incidents as representative but again could not remember how often Thomas had abused her in that way. Thomas repeatedly told A.R. not to tell anybody

- 2 -

about the abuse. A.R. did not disclose the abuse until July 2019, when she told her mother that Thomas had sexually abused her. A.R.'s mother contacted the police, who interviewed A.R. Child abuse forensic interviewer Anissa Tanksley also interviewed A.R. in July 2019. A.R. waited so long to disclose the abuse because she "felt scared" that "something was going to happen to" her if she reported Thomas.

A.R. was not Thomas's only victim at the daycare. In 2013, the trial court convicted him of aggravated sexual battery of a victim under 13 years old for an offense he committed in 2002 against a victim other than A.R. For that offense the trial court sentenced Thomas to 8 years in prison with 7 years suspended, conditioned upon 20 years of supervised probation. Thomas served his active sentence and began probation. The requirements of his probation included conditions related to his status as a sex offender as well as standard probation conditions, including that he follow his probation officer's instructions, be truthful and cooperative, and report as instructed.

Thomas's probation officer, Joseph Samluk, closely monitored Thomas's life for more than five years. He regulated Thomas's internet usage and prohibited him from visiting many public places. He also subjected Thomas to regular polygraph tests during which Thomas had to discuss intimate details about his life.

Based on A.R.'s delayed disclosures, Fairfax County police officers coordinated with Samluk to arrest Thomas at Samluk's office in September 2019. The police wanted to arrest Thomas at the probation office so that they could control the environment and minimize the risk to officer safety. Consistent with the plan, Samluk called Thomas and asked him to come to the probation office. When Thomas arrived for what he thought was a regular probation appointment, four law enforcement officers arrested him, searched him, and transported him to an interrogation room at the police headquarters.

Detective Steven Carter asked Samluk to introduce him and Detective Jerome Gadell, Jr., to Thomas. According to Samluk, the detectives wanted Thomas to "know that [Samluk] was there." After Thomas had waited in the interrogation room for about 25 minutes,[2] Samluk entered with Carter and Gadell. Carter told Thomas that he wanted Samluk to introduce them to Thomas so they could "talk about some things." Samluk then told Thomas, "This is Detective Carter, Detective Gadell. They need to talk to you about some things. I'm going to be here for a little bit, but just go ahead and chat with them today, okay?" Samluk then left the room. The detectives did not ask Samluk to say those specific words. Both detectives admitted that they had never asked a suspect's probation officer to introduce them during a custodial interrogation.

After obtaining Thomas's basic information, Carter handed Thomas a *Miranda* consent form, saying that he was doing so because "we're the government and the government loves our forms." He also told Thomas, "I know you're going to have questions about everything, and I'm happy to talk about that stuff with you, but we have to go over this form first." When Carter told Thomas that he was writing "sexual assault" on the form, Thomas sighed loudly and buried his head in his hand. Carter then read the *Miranda*[3] warnings from the consent form. He paused after each line on the form to ask if Thomas understood; Thomas sometimes nodded his head and sometimes sat silently. After reading each right, Carter asked Thomas if they all "ma[d]e sense." Thomas stated, "Yeah. I just can't believe this is happening again." Carter responded that he was more than willing to talk to Thomas about it and "clear up some things" but they needed to go through the form first.

---

[2] During that period, Gadell brought Thomas food and water; he removed Thomas's handcuffs before leaving the room but handcuffed Thomas's left hand to the arm of his chair.

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Carter then stated that "the next part is I know what my rights are. I am willing to make a statement without a lawyer present. I understand and know what I am doing. No promises or threats have been made to me by anyone." Carter read that part of the form quickly without pausing between sentences. He then told Thomas that Thomas did not have to sign the form, that it would help the detectives if he did so, and that he could still agree to talk to the detectives even if he did not sign the form. Thomas signed the form.

Thomas made incriminating statements throughout the approximately three-hour interview. For example, he admitted to putting his mouth on A.R.'s vagina three or four times and fondling her six or seven times when she "was about maybe seven or eight" years old. At one point, Carter told Thomas that A.R. alleged that Thomas's "private part" had touched A.R.'s "private part." Thomas responded that he did not remember that happening but stated that if A.R. said it happened, it probably did. Carter suggested that maybe Thomas rubbed his penis against A.R.'s vagina without penetrating her. Thomas responded that he possibly did so. Thomas wrote a letter during the interview, stating, "Dear [A.R.] I hope you can find it in your heart to forgive me one day. I hope everything will be good with you. I hope you can still have a bless[ed] life and I want nothing but the best from and for you."

Before trial, Thomas moved to suppress the incriminating statements, arguing that they were involuntary because he had been forced to choose between waiving his *Miranda* rights and violating his probation conditions. At the suppression hearing, Detectives Gadell and Carter testified that Thomas had more than a dozen police contacts during the 2012 investigation and at one point provided a voluntary statement after being read his *Miranda* rights. Both detectives acknowledged that Thomas had been described as "mentally retarded" or "intellectually disabled" in a 1999 police report. Gadell knew that Thomas attended an alternative school and

had a "mental health history" with the county government. Carter knew Thomas had attended an alternative school but was not aware whether Thomas had a mental health diagnosis.

The trial court denied Thomas's suppression motion, finding that he knowingly, intelligently, and voluntarily waived his *Miranda* rights. The court found that Thomas appeared to be in disbelief about what was happening to him but otherwise understood his circumstances and "appeared at ease." In finding that Thomas understood his rights, the court emphasized Thomas's prior experience with the criminal justice system. The court suggested that the result might have been different had Samluk told Thomas to "[a]nswer all the[ detectives'] questions truthfully" but found that Samluk's instruction to Thomas did not render his *Miranda* waiver involuntary.

The Commonwealth provided notice of intent to introduce expert testimony from Anissa Tanksley, the forensic interviewer who had interviewed A.R. Before trial, Thomas moved to exclude her testimony, arguing that it improperly opined on the ultimate issue of A.R.'s credibility. The court denied Thomas's motion "subject to the Commonwealth laying a proper foundation at trial."

Tanksley testified at trial that she worked at a children's advocacy center as a forensic interviewer. After graduating college in 2014, she trained in victim advocacy and began working in victim services. She transitioned to sexual assault response services, where she worked with two children's advocacy centers and became a forensic interviewer in 2017. She had attended trainings in child development, maltreatment, trauma, memory, and disclosure of physical and sexual abuse. She began her current role in 2020, which involves interviewing children regarding allegations of abuse. She had interviewed more than 600 children in her career. She was not a psychologist, psychiatrist, or neuroscientist, nor had she published any peer-reviewed research.

The Commonwealth moved to admit Tanksley as an expert in "child forensic interviewing with a focus on . . . disclosures of sexual assault and memory formation." Thomas objected, arguing that (1) Tanksley was not an expert in memory formation and merely relied on articles she had read, which were impermissible hearsay; (2) her testimony improperly opined on the ultimate issue in the case—A.R.'s credibility; and (3) delayed disclosure was within the average juror's understanding. The trial court overruled Thomas's objections.

Tanksley testified that delayed disclosure is common in child abuse cases and that children vary in how long they wait before disclosing. She explained that most children do not disclose, and it is "rare that a child will disclose immediately after an abusive incident." She also discussed various reasons children choose not to immediately disclose abuse. In her "training and experience," the most common explanation for delayed disclosure is fear. She added that it is common for children to disclose only part of the abuse they suffered, particularly when they have been abused repeatedly.

Tanksley also discussed how memories form in children and how children recall those memories. She explained that it can be difficult to recall specific episodes. Instead, "when a child remembers an account of what usually happened when they experienced abuse, that can actually lead to the fading of memory of some of those episodic details." Accordingly, "for children who are recalling information about historical abuse, it may be difficult for them to speak to how many times something occurred." She admitted that much of her research in memory formation came from five articles she had read that discussed international studies. She testified that those articles were consistent with her training and experience in interviewing children and that it was common for those in her field to rely on similar articles. Tanksley testified that she does not evaluate a child's credibility during a forensic interview and does not keep statistics about how often a child's claims are verified.

In his defense, Thomas sought to introduce his mother's testimony that he was forgetful and susceptible to other people's suggestions. He argued that the testimony was relevant to show that at least some of his incriminating statements were false. The court excluded the proposed testimony as "too speculative."

The jury convicted Thomas of two counts of rape, two counts of animate object sexual penetration, and two counts of aggravated sexual battery against A.R.[4] The trial court denied Thomas's subsequent motion to set aside the verdict. Thomas also pleaded guilty to aggravated sexual battery in two other cases involving two unrelated victims.

The court held a joint sentencing hearing for all three cases. Thomas filed a memorandum before the hearing, asserting that he had completed sex offender treatment, had not reoffended, and generally had been successful on probation. The memorandum also explained that Thomas had several mental health disorders, including attention deficit hyperactivity disorder, Tourette's syndrome, and various intellectual disabilities. Finally, Thomas claimed that he had experienced extreme physical and sexual abuse as a child, sometimes from his mother's boyfriends and sometimes from his teachers who did not know how to deal with his mental disorders.

Thomas's stepfather testified that Thomas had a childlike nature and that other people regularly took advantage of him. Thomas's family would support him upon his release as they had while he was on probation. Samluk testified that he had a good relationship with Thomas and that Thomas had successfully completed sex offender treatment while on probation. In fact, in 2019, Samluk considered requesting that the court terminate Thomas's probation early because it had been successful.

---

[4] The jury acquitted Thomas of two counts of rape. The trial court struck the evidence of a sodomy charge and one additional count of rape.

The Commonwealth asked the trial court to sentence Thomas to life in prison. Thomas countered that his success on probation showed that he could be rehabilitated and that a life sentence was inappropriate. He instead requested an active sentence of four or five years.

The trial court sentenced Thomas to ten years' imprisonment for each of the aggravated sexual battery charges to which he had pleaded guilty. For the crimes against A.R., the court sentenced Thomas to four life terms plus five years in prison for each of the aggravated sexual battery convictions, to run concurrently. The court found that Thomas was "a serial pedophile" and the court "ha[d] no way of protecting the community . . . other than to impose a life sentence." When Thomas objected that the court did not give due consideration to his mitigating evidence, the court responded that it had "considered all of the things . . . presented by both sides."

## ANALYSIS

### I. The trial court erred by denying Thomas's suppression motion.

#### A. *The governing legal framework*

"No person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "A defendant does not lose this protection by reason of his conviction of a crime." *Minnesota v. Murphy*, 465 U.S. 420, 426 (1984). Thus, "notwithstanding that a defendant is . . . on probation [when] he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." *Id.*

Although one seeking the Fifth Amendment's protection "*ordinarily* must assert the privilege," the Supreme Court of the United States has held that the privilege is "self-executing" in certain, inherently coercive settings. *Id.* at 429-30 (emphasis added); *see also United States v. Riley*, 920 F.3d 200, 204 (4th Cir. 2019) ("Exceptions to this general rule arise in certain situations that are viewed as inherently coercive."). No invocation is required in those circumstances. The

most common setting in which the privilege is self-executing is a custodial interrogation. *Murphy*, 465 U.S. at 429 ("A well-known exception to the general rule addresses the problem of confessions obtained from suspects in police custody.").[5] The Supreme Court has long recognized that custodial interrogation "contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Miranda v. Arizona*, 384 U.S. 436, 467 (1966); *see also Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (noting that the Supreme Court's "cases provide that those subjected to coercive police interrogations have an *automatic* protection from the use of their involuntary statements . . . in any subsequent criminal trial").

The "inherently coercive" nature of a custodial interrogation creates "a substantial risk that the police will inadvertently traverse the fine line between legitimate efforts to elicit admissions and constitutionally impermissible compulsion." *Moran v. Burbine*, 475 U.S. 412, 426 (1986). Thus, "[i]t is presumed that without proper safeguards the circumstances of custodial interrogation deny an individual the ability freely to choose to remain silent." *Garner v. United States*, 424 U.S. 648, 657 (1976). Indeed, that setting is so inherently coercive that the Supreme Court has erected a long-settled procedural hurdle to preserve the Fifth Amendment's protections: the prosecution may not "us[e] statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards *effective* to secure the privilege against self-incrimination." *Keepers v. Commonwealth*, 72 Va. App. 17, 34 (2020) (emphasis added) (quoting *Miranda*, 384 U.S. at 444); *Garner*, 424 U.S. at 657 ("Because of the danger that custodial interrogation posed to the

---

[5] The Supreme Court recognizes two additional exceptions, which make the privilege self-executing: the so-called "classic penalty" situations, *see, e.g.*, *Lefkowitz v. Cunningham*, 431 U.S. 801, 806 (1977); *Garrity v. New Jersey*, 385 U.S. 493 (1967), and certain tax-gambling cases, *see, e.g.*, *Marchetti v. United States*, 390 U.S. 39 (1968); *Grosso v. United States*, 390 U.S. 62 (1968).

adversary system favored by the privilege, the Court in *Miranda* was impelled to adopt the extraordinary safeguard of excluding statements made without a knowing and intelligent waiver of the privilege.").  At a minimum, the police must inform a suspect in their custody that he possesses certain rights, including the right to remain completely silent during questioning. *Thomas v. Commonwealth*, 72 Va. App. 560, 574 (2020) (citing *Miranda*, 384 U.S. at 479).  "A confession made during a custodial interrogation will be suppressed unless police advise the defendant of his rights under *Miranda . . .* , *and* the defendant knowingly, intelligently, and voluntary waives those rights."  *United States v. Giddins*, 858 F.3d 870, 879 (4th Cir. 2017) (emphasis added) (quoting *United States v. Holmes*, 670 F.3d 586, 591 (4th Cir. 2012)).

It is undisputed that Thomas was subjected to a custodial interrogation; thus, Thomas was not required to invoke his Fifth Amendment privilege because the protections of the Fifth Amendment were "self-executing."  Our dissenting colleague acknowledges this critical factor but still relies heavily on non-custodial cases and insists that "the invocation requirement reattach[ed]" once Detective Carter read Thomas the *Miranda* warning.[6]  *Post* at 37.  This view is incorrect.  Even when the police provide proper *Miranda* warnings, the Commonwealth still must prove under the totality of the circumstances that the suspect waived his rights "knowingly,

---

[6] *See, e.g.*, *Salinas v. Texas*, 570 U.S. 178, 182 (2013) (noting that the subject "interview was noncustodial"); *Murphy*, 465 U.S. at 430 (noting that the defendant "was not 'in custody' when he made his incriminating admissions" to his probation officer); *United States v. Linville*, 60 F.4th 890, 895 n.3, 897 (4th Cir. 2023) (noting that, when the suspect's probation officer questioned him at the probation office, the suspect "was neither in custody nor were the circumstances sufficiently coercive to require *Miranda* warnings"); *Husske v. Commonwealth*, 252 Va. 203, 207, 217 (1996) (noting that "the defendant, just as in *Murphy*, was not in custody for purposes of receiving *Miranda* protection" when he made incriminating statements during a voluntary "suicide screening" with a doctor); *Rivera-Padilla v. Commonwealth*, 55 Va. App. 304, 311 n.5 (2009) (noting that the custodial interrogation exception "clearly ha[d] no application" to the defendant's interview with the Virginia Department of Social Services concerning her eligibility for public benefits).  The distinction between a custodial and a non-custodial interrogation, however, is pivotal.  "Concerns under *Miranda* only arise when a defendant is in custody and subjected to interrogation."  *Giddins*, 858 F.3d at 879.

intelligently, and voluntarily." *Rodriguez v. Commonwealth*, 40 Va. App. 144, 155 (2003); *see In re S.W.*, 124 A.3d 89, 105 (D.C. 2015) (excluding the suspect's incriminating statements as involuntary despite finding that the detective provided proper *Miranda* warnings and the suspect never asserted the privilege). The dispositive question presented here is not whether Thomas failed to invoke the Fifth Amendment privilege; rather, the question is whether Thomas's waiver of his *Miranda* rights was voluntary.

In the context of "a Fifth Amendment self-incrimination challenge, '[v]oluntariness is a question of law, subject to independent appellate review.'" *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)). Thus, we review the voluntariness of Thomas's *Miranda* waiver de novo. *Tirado v. Commonwealth*, 296 Va. 15, 28 (2018) (citing *Gray v. Commonwealth*, 233 Va. 313, 324 (1987)). "Subsidiary factual questions, however, are entitled to a presumption of correctness." *Secret*, 296 Va. at 225 (quoting *Avent*, 279 Va. at 195).

When conducting our independent appellate review, we apply a well-established test for voluntariness by asking whether Thomas's *Miranda* waiver was "the product of an essentially free and unconstrained choice by its maker, or whether the maker's will has been overborne and his capacity for self-determination critically impaired." *Tirado*, 296 Va. at 28 (quoting *Gray*, 233 Va. at 324); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) ("The ultimate test remains . . . . Is the [waiver] the product of an essentially free and unconstrained choice by its maker?" (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961))); *Jackson v. Commonwealth*, 267 Va. 178, 190 (2004) (same); *Swann v. Commonwealth*, 247 Va. 222, 231 (1994) (same); *Jenkins v. Commonwealth*, 244 Va. 445, 453 (1992) (same). "If the suspect's will has been overborne and his capacity for self-determination critically impaired, the confession is

considered involuntary and its use is unconstitutional." *Avent*, 279 Va. at 195 (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995)).

Under settled precedent, we assess voluntariness by examining "the totality of the circumstances," including "the defendant's age, intelligence, mental and physical condition, background and experience with the criminal justice system, the conduct of the police, and the circumstances of the interview."[7] *Thomas*, 72 Va. App. at 582 (quoting *Keepers*, 72 Va. App. at 37); *Jackson*, 267 Va. at 190 ("When determining whether a defendant's statement was voluntarily given, we examine the totality of the circumstances, which include the defendant's background and experience as well as the conduct of the police in obtaining the waiver of *Miranda* rights and confession."); *Midkiff*, 250 Va. at 268 (same); *Rodriguez*, 40 Va. App. at 157 (holding that "a court determining whether a confession was voluntary must consider both 'the details of the interrogation' and 'the characteristics of the accused'" (quoting *Kauffmann v. Commonwealth*, 8 Va. App. 400, 405 (1989))); *see also Bustamonte*, 412 U.S. at 226 (collecting cases and explaining that determining voluntariness requires "a careful scrutiny of all the surrounding circumstances").

Manifestly, the maker's choice is not free and unconstrained if it is the product of intimidation, coercion, or deception by the police. *Tirado*, 296 Va. at 28 (quoting *Moran*, 475 U.S. at 421). "[E]vidence of coercive police activity 'is a necessary predicate to the finding that a [*Miranda* waiver] is not "voluntary.""" *Washington v. Commonwealth*, 43 Va. App. 291, 303

---

[7] The vileness of the crime and the severity of the ultimate sentence are not relevant factors under the totality of the circumstances test. The Fifth Amendment protects not only the innocent, but also those who are guilty of even heinous crimes. Thus, the prosecution may not introduce incriminating statements obtained in violation of *Miranda* at a defendant's capital sentencing hearing. *Estelle v. Smith*, 451 U.S. 454, 462-63 (1981). *See also Culombe*, 367 U.S. at 569 (acknowledging "the anxious task of reconciling the responsibility of the police for ferreting out crime with the right of the criminal defendant, *however guilty*, to be tried according to constitutional requirements" (emphasis added)).

- 13 -

(2004) (quoting *Commonwealth v. Peterson*, 15 Va. App. 486, 488 (1992)). Coercive activity may include "the interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." *Id.* (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)). "[A]ny evidence that the accused was threatened, tricked, or cajoled into a waiver will, of course, show that the defendant did not voluntarily waive his privilege." *Miranda*, 384 U.S. at 476.

We agree with our dissenting colleague that the record here, including the trial court's subsidiary factual findings, does not present a "classic penalty situation,"[8] a circumstance that *also* would make the Fifth Amendment privilege self-executing. *See Murphy*, 465 U.S. at 435. We disagree, however, about the significance of Thomas's custodial status and Samluk's role at its inception. Simply put, this is not an invocation case and our resolution of it requires no new exception to the invocation rule. Instead, this case fits comfortably *within* the long-settled exception for custodial interrogations. *See id.* at 429 ("A well-known exception to the general [invocation] rule addresses the problem of confessions obtained from suspects in police custody."). Clearly established and widely recognized precedent demonstrates that in the inherently coercive custodial interrogation setting the defendant need not invoke his Fifth Amendment privilege; rather, in that circumstance, the privilege is self-executing. *Miranda*, 384 U.S. at 467-68; *Murphy*, 465 U.S. at 429-30; *United States v. Frierson*, 945 F.2d 650, 660 (3d Cir. 1991) (explaining that in custodial interrogation settings, absent a valid *Miranda* waiver, "statements are deemed 'compelled' and are inadmissible although the privilege was *never claimed*" (emphasis added)). The Commonwealth bore the burden of proving that the

---

[8] The State creates a "classic penalty situation" if it "either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation." *Murphy*, 465 U.S. at 435. In such a circumstance, a suspect's failure to assert the privilege would be excused, and his answers would be "deemed compelled and inadmissible in a criminal prosecution." *Id.*

- 14 -

government followed all the required procedural safeguards to ensure that Thomas's waiver of the self-executing privilege was the product of a free and unconstrained choice. *Tirado*, 296 Va. at 28; *Gray*, 233 Va. at 324; *see also Bustamonte*, 412 U.S. at 225. That burden is nothing new or unique to the facts of this case. The Commonwealth bears that burden in all custodial interrogation cases, irrespective of a probation officer's participation. *See Rodriguez*, 40 Va. App. at 155 (citing *Mills v. Commonweatlh*, 14 Va. App. 459, 468 (1992)). With that proper and well-settled framework in mind, we examine de novo whether Thomas's *Miranda* waiver was voluntary under the totality of the circumstances presented here. As we explain, under the unique and specific circumstances of this case, it was not.

### B. The officers' coercive conduct

The specific facts and circumstances of this case demonstrate that the detectives employed coercive tactics. To begin, they exploited Thomas's relationship with Samluk, who had supervised Thomas for more than five years. As a condition of his probation, Thomas had to obey all of Samluk's instructions or risk the revocation of his suspended seven-year sentence.[9] The detectives capitalized on that relationship and circumstance. First, they had Samluk summon Thomas to the probation office for what Thomas thought was a routine probation appointment. Then, when Thomas reported as instructed, detectives arrested, handcuffed, and transported him to police headquarters. At Detective Carter's request, Samluk also went to police headquarters.[10] Once there, the detectives asked Samluk to introduce them to Thomas before the interrogation, so that

---

[9] The interrogation predated the enactment of Code § 19.2-306.1. Accordingly, the trial court could have revoked the entirety of Thomas's suspended sentence for any probation violation. *See* Code § 19.2-306(A) (2019); 2021 Va. Acts Spec. Sess. I ch. 538.

[10] The trial court found that Samluk placed himself "in an unusual situation" by going to the police station, which the court found was "not the best idea."

Thomas would "know that [Samluk] was there." During those introductions, Samluk *instructed*[11] Thomas to "go ahead and chat with" the detectives "today." He also told Thomas that he would remain at police headquarters for "a little bit."

Those circumstances were, even by the detectives' account, unusual. Detectives Carter and Gadell each stated that they had *never* enlisted a suspect's probation officer in this way during a custodial interrogation despite Carter having conducted "hundreds" of interviews.[12] The trial court found "*the instruction* is kind of, 'Chat with them a little bit,'" but that Samluk did not tell Thomas to answer the officers' questions "'or else' *in so many words*," so we agree with the dissent that the trial court's finding forecloses the "classic penalty situation" exception. (Emphasis added). But we are persuaded that the finding also acknowledges the tacit pressure to speak.[13] An expressly spoken "or else" was unnecessary because Thomas was under compulsion to follow Samluk's instructions as a condition of his probation and Samluk's instruction conflicted with Thomas's Fifth Amendment right to remain silent. *Cf. S.W.*, 124 A.3d at 104 ("In any custodial interrogation 'the seemingly benign transmittal of information to an accused may resemble the kind of mental games that largely generated the *Miranda* decision itself.'" (quoting *United States v. Brown*, 737 A.2d 1016, 1021 (D.C. 1999))).

---

[11] Our dissenting colleague characterizes Samluk's action as a "request" but the trial court expressly found that Samluk instructed Thomas to speak with the officers. *Post* at 44, 45.

[12] Despite criticizing us for applying an unprecedented approach to Samluk's preliminary participation in the custodial interrogation, the dissent does not identify a single case approving similar participation by a probation officer. The trial court lamented the lack of precedent and found that the case presented "a question of first impression."

[13] The Fifth Amendment is concerned with "governmental coercion," not merely the coercion stemming from Thomas's immediate interrogators. *See Colorado v. Connelly*, 479 U.S. 157, 170 (1986). Indeed, Samluk's instruction to Thomas to "chat with" the officers, presented what the trial court found was a "close call." Many of the trial court's other factual findings, such as the court's finding that Thomas appeared to "understand what was going on," pertained to whether Thomas waived his rights knowingly and intelligently, an issue we do not consider here.

Moreover, unlike the probationer in *Murphy*, Thomas's probation obligation included not only being truthful with Samluk, but also following all of Samluk's instructions. Thomas signed a form at the outset of his probation acknowledging that condition and his understanding that failure to comply with his probation conditions could result in his probation being revoked. Thomas thus could not simultaneously comply with Samluk's *instruction* to "chat with" the detectives "today" and invoke his Fifth Amendment right to remain silent. *Cf. United States v. Saechao*, 418 F.3d 1073, 1079 (9th Cir. 2005) ("The Fifth Amendment proscribes the use in a separate criminal proceeding of a statement obtained pursuant to a probation condition that requires a probationer to 'choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" (quoting *Murphy*, 465 U.S. at 436));[14] *People v. Garcia*, 391 P.3d 1153, 1156 (Cal. 2017) (holding that, because a probation condition compelled the defendant's statements, those statements could not "lawfully be used against him a criminal proceeding"); *State v. Eccles*, 877 P.2d 799, 801 (Ariz. 1994) (en banc) (holding that a probation condition that requires a defendant to waive his Fifth Amendment rights is unconstitutional). The dissent notes that the Arizona Supreme Court noted in *Eccles* that the improper probation condition could be revised to meet constitutional standards. *Post* at 41-42. The proposed revisions notably omitted questioning by police officers investigating crimes for which the probationer has not been convicted. *Eccles*, 877 P.2d at 801. And here, the questions put to Thomas could and did incriminate him in future criminal proceedings. *Cf. id.* (noting that the "sanitized condition" only required a defendant "to respond to questions that could *not* incriminate him in future criminal proceedings" (emphasis added)). Thus, Thomas's position in custody made Samluk's instruction coercive.

---

[14] In *Saechao*, the Ninth Circuit distinguished *Murphy* and held that a probation condition requiring a probationer to "promptly and truthfully *answer all* reasonable inquiries . . . by implication forecloses a probationer's ability to exercise [his Fifth Amendment] right by remaining silent." *Saechao*, 418 F.3d at 1079.

- 17 -

The trial court's subsidiary factual findings do not undermine our conclusion because "[s]ubtle psychological coercion suffices . . . and at times [may be] more effective[], to overbear 'a rational intellect and a free will.'" *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (holding a confession involuntary where the interrogating officer's statements caused the defendant to fear that she would not see her children for a long time unless she cooperated); *see also Bustamonte*, 412 U.S. at 228 (explaining that coercion that is "subtly . . . applied" may render involuntary a suspect's consent to search under the Fourth Amendment); *S.W.*, 124 A.3d at 101 ("[W]e take great care to assess the impact of subtle interrogation tactics."). Neither did the officers provide any assurance that no penalty would be exacted if he disregarded Samluk's instruction to "chat with" the officers. *Cf. Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (plurality) ("[T]elling a suspect that 'anything you say can and will be used against you,' *without expressly excepting* [an incriminating statement already given] could lead to an entirely reasonable inference that what he has just said will be used, with subsequent silence being of no avail." (emphasis added)).

By focusing on the lack of an explicit threat and contending that our "rationale hinges on the probation officer's" statement, the dissent wrongly divorces Samluk's instruction from the context in which it occurred. *Post* at 35. Settled precedent requires that our voluntariness analysis consider the totality of the circumstances. *Bustamonte*, 412 U.S. at 226; *Secret*, 296 Va. at 226; *Thomas*, 72 Va. App. at 582; *Jenkins*, 244 Va. at 454. In undertaking that analysis, "we eschew any 'divide-and-conquer analysis' that ignores the 'totality of the circumstances.'" *Shifflett v. Commonwealth*, 58 Va. App. 732, 740 (2011) (quoting *United States v. Arvizu*, 534 U.S. 266, 274 (2002)); *see also People v. Stewart*, Mich. No. 162497, 2023 WL 4874412, at *11 (Mich. July 31, 2023) (recognizing that "we must consider the circumstances collectively and their cumulative effect on defendant's free will"); *State v. Baker*, 465 P.3d 860, 870 (Haw. 2020) ("Crucially, a court must not analyze the individual circumstances in isolation, but must weigh

those circumstances in their totality."); *State v. Fernandez-Torres*, 337 P.3d 691, 696 (Kan. Ct. App. 2014) ("Voluntariness ultimately must be determined holistically."); *S.W.*, 124 A.3d at 93 ("We reinforce the necessity of looking holistically at every custodial interrogation in reaching a conclusion specific to the facts presented.").

Samluk was not required to remind Thomas of his probation conditions every time he gave Thomas an instruction. Even if Samluk subjectively did not intend to revoke Thomas's probation, we will not impose on Thomas the obligation to discern the probation officer's subjective intent because Thomas had no way to assess it. *See Mace v. Amestoy*, 765 F. Supp. 847, 851 (D. Vt. 1991) ("The petitioner could not possibly assess the likelihood of prosecution which is totally dependent upon the discretion of the state's attorney."). Thomas reasonably could have understood, based on the literal meaning of Samluk's words, that he was required as a condition of his probation to talk to the detectives "today." Thomas also reasonably could have interpreted Samluk's statement that he would remain at police headquarters "for a little bit" to indicate that he would know if Thomas had not obeyed his instruction to speak with the detectives, further raising the specter of revocation for non-compliance.

No new per-se rule follows from our recognition that the unique and specific facts of this case demonstrate Thomas was subjected to coercive pressures to waive his *Miranda* rights.[15]

> The line between proper and permissible police conduct and techniques and methods offensive to due process is, at best, a difficult one to draw, particularly in cases such as this where it is necessary to make fine judgments as to the effect of psychologically coercive pressures and inducements on the mind and will of an accused.

---

[15] The problem presented here is not that Samluk was "involved" in the interrogation. *Post* at 35, 44. The problem is that Samluk specifically instructed Thomas to speak with the officers.

*United States v. Preston*, 751 F.3d 1008, 1028 (9th Cir. 2014) (quoting *Haynes v. Washington,* 373 U.S. 503, 515 (1963)).  Rather, we consider the tacit pressure Samluk's instruction created "as a relevant circumstance to be considered as one factor in the voluntariness analysis, which is consistent with decades of established caselaw."  *Stewart*, 2023 WL 4874412, at \*10.

### C.  The Miranda *warning was ineffective*

The detectives did not cure the effects of their coercive conduct merely by reciting Thomas's *Miranda* rights.  The Supreme Court has recognized that "it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." *Seibert*, 542 U.S. at 611.  If the surrounding circumstances show that the *Miranda* warnings were ineffective to safeguard the privilege, the resulting *Miranda* waiver is not voluntary.  *Id.*  "[U]nless the warnings could place a suspect" in a position to make a *genuinely informed* choice, "there is no practical justification for accepting the formal warnings as compliance with *Miranda*."  *Id.* at 612. "The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Miranda*, 384 U.S. at 476.  Indeed, a "confession, even if obtained in full compliance with *Miranda*, may be inadmissible if it was not voluntary."  *Kauffman*, 8 Va. App. at 405.

*Miranda* warnings may be ineffective because of law enforcement conduct during or preceding the warnings.  *See, e.g.*, *Stewart*, 2023 WL 4874412, at \*11 (improper promises of leniency); *Giddins*, 858 F.3d at 883 (misleading responses about the effect of the statements). For example, when an officer deliberately obtains a prewarning confession before advising the suspect of his *Miranda* rights, later warnings are ineffective unless they clarify that the suspect may remain silent *notwithstanding* his earlier decision to speak.  *Seibert*, 542 U.S. at 612-14.

Similarly, when an officer has a lengthy prewarning conversation with a suspect that "soften[s]-up" that suspect to waive his rights before the officer formally advises him of those

rights, the formal advisement is ineffective. *People v. Honeycutt*, 570 P.2d 1050, 1054-55 (Cal. 1977). *Miranda* warnings may also be ineffective when the officers "downplay[] the importance of the advisement and the rights contained therein," and "impl[y] that the advisement [is] a mere formality." *People v. Smiley*, 530 P.3d 639, 649 (Colo. 2023). Thus, special caution should be applied in circumstances where pre-warning conduct "obscure[s] both the practical and legal significance of the admonition when finally given." *Secret*, 296 Va. at 223 (quoting *Seibert*, 542 U.S. at 620 (Kennedy, J. concurring)). As with the rest of the analysis, therefore, we must consider the totality of the circumstances when determining whether *Miranda* warnings neutralized the coercive circumstances present here.[16]

Under the facts of this case, Carter's recital of the *Miranda* warnings was ineffective to cure the coercive circumstances. As noted, the warnings did not clarify that Samluk's *instruction* that Thomas "chat with" the detectives had no bearing on Thomas's right to remain silent. Neither Samluk nor the detectives clarified that Thomas would *not* suffer any adverse probationary consequences if he chose to stand on his self-executing right to remain silent even though doing so would violate Samluk's express instruction. *Cf. Seibert*, 542 U.S. at 612-14. Samluk's prewarning statement coercively primed Thomas to waive his rights *before* Carter read from the *Miranda* form, and the officers provided no additional procedural safeguards to cure that problem. *See, e.g.*,

---

[16] Relying on *Oregon v. Elstad*, 470 U.S. 298 (1985), the dissent asserts that "courts normally presume that [*Miranda*] warnings neutralize the coercion implicit in custodial settings enough to shift back to the defendant the obligation to invoke his Fifth Amendment rights." *Post* at 37. But as the *Seibert* Court recognized, *Elstad* did not involve any coercive police conduct. *Seibert*, 542 U.S. at 614-16. And *Elstad* itself made clear that the Court did not "condone inherently coercive police tactics or methods offensive to due process that . . . undermine the suspect's will to invoke his rights once they are read to him." *Elstad*, 470 U.S. at 317. "Indeed, as the Court explained, the *Miranda* exclusionary rule 'sweeps more broadly than the Fifth Amendment itself' because the Fifth Amendment only prohibits the use of compelled testimony by the prosecution in its case in chief." *Secret*, 296 Va. at 218 (quoting *Elstad*, 470 U.S. at 306-07).

*Giddins*, 858 F.3d at 883 (recognizing the importance of how a reasonable person would understand the pre-warning statements authorities made).

Additionally, when the *Miranda* warning finally came, Carter repeatedly deemphasized its importance and presented it as a mere formality. *Smiley*, 530 P.3d at 649. Throughout, Carter kept the focus on the *Miranda* waiver *form*, which he presented as an administrative box they needed to check before *he* could answer Thomas's questions. Carter told Thomas that they needed to discuss the form because "we're the government and the government loves our forms." He presented the form as impeding his ability to help Thomas explaining, "I know you're going to have questions about everything, and I'm happy to talk about that stuff with you, but we have to go over this form first." Rather than emphasize that he was asking Thomas to waive his constitutional rights, Carter characterized the form's waiver language as merely "the next part" of the form before reading the rights being waived or the consequences of the waiver without explanation or pause. Carter then told Thomas that it would help the detectives if Thomas signed the form but that he could "still agree" to talk to them even if he did not sign it. Carter's characterization of the *Miranda* rights as a mere formality, in the context of the doubly coercive environment the officers had created, rendered the warnings ineffective to resolve the apparent conflict between Thomas's rights and Samluk's instruction.

### D. Thomas's will was overborne

Settled precedent requires us to examine the totality of the circumstances to determine whether Thomas made a free choice to waive his rights. *Tirado*, 296 Va. at 28; *Gray*, 233 Va. at 324; *Bustamonte*, 412 U.S. at 225; *Stewart*, 2023 WL 4874412, at *13. The totality of the circumstances presented here demonstrate that Thomas's waiver was not the product of a free and unconstrained choice. The trial court made no findings concerning Thomas's education or

intellectual ability, but the record demonstrates that Thomas's background and experience made him particularly vulnerable to the coercion applied in this case.

"An individual's repeated exposure to *Miranda* warnings *may* weigh in favor of concluding that the individual knowingly and intelligently waived those rights." *Rodriguez*, 40 Va. App. at 157 (emphasis added). And "a low intelligence quotient, in and of itself, does not mean that a suspect is incapable of waiving his rights." *Rankin v. State*, 1 S.W.3d 14, 19 (Ark. 1999). Nevertheless, "[i]f mental impairment of whatever kind should have reasonably been apparent to the interrogators, special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary." *United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994). "Coercive tactics that can overbear an individual's will include both physical intimidation and psychological pressure." *Stewart*, 2023 WL 4874412, at *4; *Smith v. Duckworth*, 910 F.2d 1492, 1497 (7th Cir. 1990) (explaining that, "while a finding of involuntariness cannot be predicated solely upon [a defendant's] mental instability, his mental state is relevant 'to the extent it made him more susceptible to mentally coercive police tactics'" (quoting *Andersen v. Thieret*, 903 F.2d 526, 530 n.1 (7th Cir. 1990))).

Indeed, "the degree of pressure necessary to crush one's will varies with the individual." *Robinson v. Commonwealth*, 63 Va. App. 302, 311 (2014) (quoting *Hill v. Commonwealth*, 52 Va. App. 313, 319 (2008)). A person "of normal intelligence . . . is more resistant to interrogation than a person who is very young, uneducated or weak minded." *Miller v. Fenton*, 796 F.2d 598, 606 (3d Cir. 1986). It simply "takes less" in terms of sophisticated police interrogation techniques "to interfere with the deliberative processes of one whose capacity for rational choice is limited than it takes to affect the deliberative processes of one whose capacity is not so limited." *Preston*, 751 F.3d at 1023 (quoting *Duckworth*, 910 F.2d at 1497). C*ompare id.* (considering defendant's "reduced mental capacity" as among the circumstances rendering his

- 23 -

confession involuntary); *Thomas v. North Carolina*, 447 F.2d 1320, 1322 (4th Cir. 1971) (finding a confession involuntary in part because of the defendant's "low mentality" and "limited education"), *with Avent*, 279 Va. 195 (finding the defendant's *Miranda* waiver voluntary in part because the defendant was "a man of at least average intelligence"); *Jackson*, 267 Va. at 190 ("The court also noted that the defendant had a reported IQ score of 100 and an educational level sufficient to read and write."); *Roach v. Commonwealth*, 251 Va. 324, 341 (1996) ("The record shows that Roach was of average intelligence, and that he telephoned Sheriff Morris to initiate the questioning."); *Swann*, 247 Va. at 231 ("Swann, a high school graduate who had attended one semester of college, was no stranger to the judicial system."). Moreover, a suspect who "suffers from mental disabilities and deficiencies" is "less likely to clearly invoke his right to counsel or to remain silent," is "more likely to 'parrot' back the details the officers suggested, whether or not they [are] true," and is "more likely to place stock in any promises or threats that the officers made, however ambiguous they might be." *State v. Rettenberger*, 984 P.2d 1009, 1016-17 (Utah 1999).

The record establishes that detectives knew that an earlier police report had described Thomas as "intellectually disabled."[17] They also knew that Thomas had attended an alternative school and had a mental health history with the county government. Thomas's impaired functioning made it more likely that he would have understood Samluk's instruction as an implied threat. *See id.*

Thomas's experience with the criminal justice system also rendered him more susceptible to the tacit pressure present here than the average suspect.[18] We will not reflexively hold any prior

---

[17] The trial court made no factual findings concerning Thomas's personal characteristics and how those characteristics impacted his ability to resist the coercion brought to bear against him.

[18] We are of course bound by the trial court's factual determinations about Thomas's experience. *Secret*, 296 Va. at 225. The effect of that experience on the voluntariness of Thomas's waiver, however, is a legal question.

experience with the criminal justice system against a defendant in all cases. Rather, as settled precedent requires, we must view this case under the totality of the circumstances, considering the implications of that experience for Thomas under the facts of this case. The Commonwealth emphasizes Thomas's experience during the 2012 investigation, but Thomas's interactions with the criminal justice system did not end in 2012. To the contrary, he had participated in highly structured supervised probation as a sex offender for nearly six years before the interrogation, forgoing many rights enjoyed by non-probationers. For example, Samluk routinely monitored Thomas's internet browsing and had instructed him to stay away from certain public places like libraries, parks, and schools. Thomas had to disclose to Samluk—often as part of a polygraph test—such personal details about his life as his romantic partners, how often he masturbated, and what he watched on television. And the record evidence confirms that Thomas consistently complied with Samluk's instructions. In other words, Thomas's experience with the criminal justice system was dominated by compelled disclosures and acquiescence to Samluk's instructions, even regarding the most intimate areas of his life. Despite Thomas's prior experience with *Miranda*, the challenged interrogation was the first time he had been asked to reconcile his *Miranda* rights with his apparently competing and compelling probation obligations.

### E. Totality of the circumstances

Thomas is a man of limited intellectual functioning who for years had obeyed his probation officer's instructions because he knew that failure to do so could result in the loss of the "grace" the prior sentencing court had extended to him. *Garibaldi v. Commonwealth*, 71 Va. App. 64, 69 (2019). The detectives subjected Thomas to an inherently coercive custodial interrogation exacerbated by the tacit pressure of a possible probation revocation. The detectives' subsequent reading of the *Miranda* warnings—presented to Thomas as a mere formality—failed to cure the coercive circumstances presented here, which overbore Thomas's ability to make a free and

unconstrained choice.  We thus conclude that, under the unique circumstances of this case,

Thomas's *Miranda* waiver was involuntary, and his incriminating statements were inadmissible.

### F.  *Admitting the involuntary statements was not harmless error*

Admitting Thomas's incriminating statements was not harmless error.  When analyzing

constitutional harmless error, we ask whether it is "clear beyond a reasonable doubt that a rational

[factfinder] *would have* found the defendant guilty absent the error."  *Commonwealth v. White*, 293

Va. 411, 422 (2017) (alteration in original) (quoting *Neder v. United States*, 527 U.S. 1, 17 (1999)).

"A confession is like no other evidence."  *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991).

Incriminating statements, "deliberately made, precisely identified and clearly proved afford[]

evidence of a most satisfactory nature and may furnish the strongest and most convincing evidence

of truth."  *Prince v. Commonwealth*, 228 Va. 610, 613 (1985).  Here, Thomas's incriminating

statements were powerful evidence, without which the Commonwealth's case rested primarily on

A.R.'s testimony.  A fact finder should access A.R.'s credibility without the improperly admitted

statements.

In sum, applying well-settled precedent, we hold that based on the totality of the

circumstances presented in this case, Thomas's *Miranda* waiver was not the product of a free and

unconstrained choice, and the trial court erred in reaching a contrary conclusion.  That error was not

harmless.  Accordingly, we reverse Thomas's jury convictions and remand for a new trial should

the Commonwealth be so advised.[19]

---

[19] Given our holding that Thomas's *Miranda* waiver was involuntary, we do not address his separate argument that it also was not knowing or intelligent.  "[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'"  *Taylor v. Commonwealth*, 78 Va. App. 147, 157 (2023) (quoting *Commonwealth v. Swann*, 290 Va. 194, 196 (2015)).

In addition, when we remand a case for a new trial, we generally address only the issues in the appeal that are likely to arise on remand.  *Cain v. Lee*, 290 Va. 129, 136 (2015); *Campbell v. Commonwealth*, 162 Va. 818, 831-32 (1934).  Thomas's first assignment of error argues that the trial court erred by excluding his mother's testimony, which was relevant to explain why he made

II. The trial court did not abuse its discretion by allowing Tanksley's expert testimony.

"It is well-settled that '[d]ecisions regarding the admissibility of evidence "lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion."'" *Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (quoting *Blankenship v. Commonwealth*, 69 Va. App. 692, 697 (2019)). "A court has abused its discretion if its decision was affected by an error of law or was one with which no reasonable jurist could agree." *Tomlin v. Commonwealth*, 74 Va. App. 392, 409 (2022). Whether to admit or exclude expert testimony is similarly "a matter within the sound discretion of the circuit court, and we will reverse the circuit court's judgment only when the court has abused this discretion." *Lucas v. Riverhill Poultry, Inc.*, 300 Va. 78, 92 (2021).

Generally, expert testimony is permitted if three conditions are met. First, the witness must be "qualified as an expert by knowledge, skill, experience, training, or education." Va. R. Evid. 2:702(a)(i)-(ii). Second, the testimony must be "scientific, technical, or other specialized knowledge [that] will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Finally, the testimony must be "beyond the knowledge and experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Va. R. Evid. 2:702(a)(ii).

Thomas contends that Tanksley's testimony was inadmissible because (1) the average juror already understands delayed disclosure; (2) the testimony commented directly on A.R.'s credibility; and (3) the testimony was inadmissible hearsay.[20] We address each argument in turn.

_____

the incriminating statements. Given our holding, the controversy surrounding that testimony is unlikely to arise on remand in the same posture that it is presented to us in this appeal. Accordingly, we do not consider that assignment of error. The admissibility of Tanksley's testimony, however, is likely to arise on remand. Thus, we consider Thomas's challenge to that testimony.

[20] Thomas conceded at oral argument that he is not challenging Tanksley's qualifications on appeal.

Binding precedent forecloses Thomas's first argument. We have previously held that experts can possess knowledge in delayed disclosure above that possessed by the average juror. *See, e.g.*, *Stevens v. Commonwealth*, 72 Va. App. 546, 553-56 (2020) (holding that an expert witness's "general testimony about the circumstances faced by child sexual abuse victims and the reasons why they often delay reporting the abuse . . . was appropriate for the jury's consideration" and that the expert possessed knowledge of child abuse reporting "beyond that of persons of common intelligence and ordinary experience" (quoting *Justiss v. Commonwealth*, 61 Va. App. 261, 271 (2012))); *Kilby v. Commonwealth*, 52 Va. App. 397, 411 (2008) (holding that the Commonwealth's delayed disclosure expert "clearly ha[d] 'a degree of knowledge of a subject matter beyond that of persons of common intelligence and ordinary experience'" (quoting *Conley v. Commonwealth*, 273 Va. 554, 560 (2007))). Although the average juror may understand that delayed reporting sometimes occurs, they can still benefit from context about why and how often provided by an expert in the field.

Turning to Thomas's second argument, jurisdictions are split on whether to admit expert testimony about children's behavior following alleged abuse. A majority of states permit general expert testimony about how sexually abused children act after being abused but do not allow direct or indirect endorsement of a child's credibility. *See, e.g.*, *State v. Celis-Garcia*, 344 S.W.3d 150, 159-60 (Mo. 2011) (en banc) (explaining that expert testimony about "the general behaviors and characteristics commonly found in children who have been sexually abused" may be admitted but "particularized testimony . . . regarding the specific victim's credibility . . . usurps the jury's province to determine a witness's credibility"); *State v. Hazelton*, 987 A.2d 915, 921-22 (Vt. 2009) (explaining that "expert testimony regarding the profile of young sexual assault victims" is admissible but may not be "tantamount to a direct comment that the complainant [is] telling the truth about the alleged sexual assault" (alteration in original)); *Commonwealth v. Federico*, 683

- 28 -

N.E.2d 1035, 1038-40 (Mass. 1997) (allowing a "description of the general or typical characteristics shared by child victims of sexual abuse" but disallowing commentary on a specific child's behavior).[21]

This Court has not directly addressed the argument that delayed disclosure testimony usurps the jury's function in determining credibility. Thomas relies on *Davison v. Commonwealth*, 18 Va. App. 496, 499-501 (1994), in which the Commonwealth proffered the victims' therapist as an expert in why a child victim might recant an allegation of sexual abuse. This Court held that the expert's testimony was inadmissible because the proffered expert had read only a single article on child recantation and thus was not qualified to testify as an expert about that issue. *Id.* at 503. In addition, the Court held that the expert's testimony was offered solely to bolster the credibility of one of the victims, violating the rule that "an expert may not 'express an opinion as to the veracity of any witness." *Id.* at 504 (quoting *Fitzgerald v. Commonwealth*, 223 Va. 615, 630 (1982)). As we explained, "[s]uch evidence is a comment on an ultimate fact within the province of the jury and must be excluded by the trial court." *Id.* at 504.

In allowing delayed disclosure testimony, *Stevens* and *Kilby* distinguished *Davison*, but only as to the degree of qualifications of the experts involved. *See Stevens*, 72 Va. App. at 555-56; *Kilby*, 52 Va. App. at 411. *Stevens* and *Kilby* suggest that expert testimony about delayed disclosure is admissible in Virginia, but neither case directly addressed Thomas's ultimate fact argument.[22]

---

[21] A minority of states bar generalized expert testimony while others allow testimony particularized to the victim. *Compare, e.g.*, *Sanderson v. Commonwealth*, 291 S.W.3d 610, 612-14 (Ky. 2009) (explaining that, in Kentucky, expert testimony that it is common for sexually abused victims to delay reporting the abuse is inadmissible), *with Townsend v. State*, 734 P.2d 705, 707-08 (Nev. 1987) ("[I]t was proper for the State's expert to express an opinion on the issue of whether the child had, in fact, been sexually assaulted or abused.").

[22] In *Kilby*, the defendant raised that argument on appeal but failed to preserve appellate review by not raising it in the trial court. *Kilby*, 52 Va. App. at 408. In *Stevens*, the defendant waived his challenge to the Commonwealth's expert's delayed disclosure testimony by introducing his own expert testimony on the same subject. *Stevens*, 72 Va. App. at 556-57. And although this

Noting some tension between *Davison* and *Kilby*, one commentator has stated that "[i]t appears that Virginia will permit a qualified expert to testify to some extent, but it is not altogether clear what will or will not be permitted." 7 *Jones on Evidence* § 57:60 (7th ed. 2023).

We now clarify our case law. An expert may provide general testimony about memory formation and common post-abuse behavior but may not directly comment on the credibility of any witness. Expert testimony that child abuse victims often delay disclosing their abuse may make it more likely that the jury believes a victim's testimony, but that consequence is different from an expert opining that the victim is credible. Thus, expert testimony about memory formation and the reason for and frequency of delayed disclosures can help the jury contextualize the victim's testimony without usurping the jury's ultimate role in determining credibility.

Here, Tanksley testified that abused children often delay disclosing their abuse but she did not suggest that delayed disclosures by child victims were more or less credible than contemporary disclosures or disclosures by adult victims. In fact, she testified that she does not evaluate the credibility of the children she interviews and expressly stated she does not know how often allegations turn out to be true. Thus, Tanksley's testimony was materially different from the expert's testimony in *Davison*. In that case, the expert witness testified that "the majority of the times kids don't lie about" being abused and that the most common reason for a victim to recant "may apply directly to this case." *See Davison*, 18 Va. App. at 501-02.

Finally, Tanksley's reliance on studies not entered into evidence does not render her testimony impermissible hearsay. "Generally, an expert witness in Virginia has not been permitted to base [her] opinion on facts not in evidence." *Simpson v. Commonwealth*, 227 Va. 557, 565-66 (1984) (citing *Ortiz v. Barrett*, 222 Va. 118, 130 (1981)). Yet an expert may rely on "objective data

Court addressed the defendant's argument challenging the Commonwealth's memory formation testimony in *Stevens*, that challenge was solely to the expert's qualifications. *Id.* at 558-59.

customarily relied on by other experts in the field . . . when that data has not been prepared for the sole purpose of arriving at a specific opinion in the case." *Papuchis v. Commonwealth*, 15 Va. App. 281, 284 (1992) (citing *Kern v. Commonwealth*, 2 Va. App. 84, 87-88 (1986)). For example, we have allowed an expert in forensic serology to rely on published studies of population statistics to form an opinion about the prevalence in the general population of the victim's blood characteristics. *See Funderburk v. Commonwealth*, 6 Va. App. 334 (1988). The Commonwealth may not, however, enter those studies into evidence. *Papuchis*, 15 Va. App. at 285. Hearsay materials on which an expert relies are not admissible in a criminal case. *Id.*

Thomas's reliance on *Papuchis* is misplaced because, as he concedes, the Commonwealth did not offer into evidence the articles on which Tanskley relied.[23] Thomas, though, contends that Tanksley's repeated references to what the "research suggested" was "tantamount to admitting the articles themselves." We reject that contention because it clashes with the relevant precedents and would overly restrict expert testimony. Just as the expert's testimony in *Funderburk* about population statistics was not the functional equivalent of entering those studies into evidence, Tanksley's testimony about the "research" was not impermissible hearsay. *See Stevens*, 72 Va. App. at 559 (noting that the expert "based her testimony on her 'training, experience, and . . . [the] literature'").

Tanksley testified that the articles she had read were consistent with her training and experience and that it was common for those in her field to rely on such articles. Based on that testimony, we cannot say that the trial court abused its discretion in allowing Tanksley to testify about the research or in denying Thomas's motion to set aside the verdict on that basis.

_____

[23] Thomas's reliance on *Earnest v. Commonwealth*, 61 Va. App. 223 (2012), is similarly misplaced. In *Earnest*, this Court held that the witness could not testify about outside reports or cases because he was not a qualified expert. *Id.* at 228-29.

III. The trial court did not abuse its sentencing discretion.

Determining the sentence "lies within the sound discretion of the trial court. A sentencing decision will not be reversed unless the trial court abused its discretion." *Garibaldi*, 71 Va. App. at 67 (quoting *Martin v. Commonwealth*, 274 Va. 733, 735 (2007)). "Criminal sentencing decisions are among the most difficult judgment calls trial judges face." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 563 (2016). "Because this task is so difficult, it must rest heavily on judges closest to the facts of the case—those hearing and seeing the witnesses, taking into account their verbal and nonverbal communication, and placing all of it in the context of the entire case." *Id.* Consequently, "when a statute prescribes a maximum imprisonment penalty and the sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." *Id.* at 564 (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007)). It is also within the trial court's purview to weigh a defendant's mitigation evidence. *Keselica v. Commonwealth*, 34 Va. App. 31, 36 (2000).

The trial court sentenced Thomas to 10 years' imprisonment for each count of aggravated sexual battery of a victim under 13 years old to which he pleaded guilty.[24] Each of those offenses carried a statutory sentencing range of 1 to 20 years in prison. Code § 18.2-67.3(B). "[O]nce it is determined that a sentence is within the limitations set forth in the statute under which it is imposed, appellate review is at an end." *Thomason v. Commonwealth*, 69 Va. App. 89, 99 (2018) (quoting *Minh Duy Du*, 292 Va. at 565). The trial court was not required to mention any of Thomas's mitigation evidence or explain the weight it attached to that choice. *See Bowman v. Commonwealth*, 290 Va. 492, 500 n.8 (2015) ("Absent a statutory requirement to do so, 'a trial

---

[24] Because we reverse Thomas's jury convictions, we do not address the challenge to his sentences for those convictions.

court is not required to give findings of fact and conclusions of law.'" (quoting *Fitzgerald*, 223 Va. at 627)).

Finally, Thomas is not entitled to a remand for resentencing for the offenses against different victims based on our reversal of his convictions for the charges related to A.R. Our Supreme Court has held that, where the defendant is sentenced jointly for multiple offenses, the reversal of some of those convictions and affirmance of others does not entitle the defendant to resentencing on the affirmed convictions. *Woodard v. Commonwealth*, 287 Va. 276, 281-82 (2014). Because the sentencing guidelines "are discretionary, rather than mandatory" and cannot serve as the basis for relief on appeal, the defendant does not show prejudice by showing that the guidelines would be different on resentencing. *Id.* (citing Code § 19.2-298.01(F)); *see also Fazili v. Commonwealth*, 71 Va. App. 239, 248-49 (2019). Moreover, although the trial court held a joint sentencing hearing, it imposed separate sentences for each of Thomas's offenses. Accordingly, Thomas has not shown prejudice based on his contention that the evidence would be different during resentencing.

"The statutes dealing with probation and suspension are remedial and intended to give the trial court valuable tools to help rehabilitate an offender." *Howell v. Commonwealth*, 274 Va. 737, 740 (2007). "When coupled with a suspended sentence, probation represents 'an act of grace on the part of the Commonwealth to one who has been convicted and sentenced to a term of confinement.'" *Hunter v. Commonwealth*, 56 Va. App. 582, 587 (2010) (quoting *Price v. Commonwealth*, 51 Va. App. 443, 448 (2008)). Defendants who spurn that act of grace are routinely punished. But Thomas presents the opposite side. He has substantially availed himself of the rehabilitative tools provided him. He has completed sex offender treatment. He has been successful on probation. And most importantly, he has not committed any new offenses. We commend Thomas for his substantial efforts. That said, it is not for us to weigh Thomas's

mitigation evidence.  The precedent in this area is clear and binding, and we affirm Thomas's sentences.

## CONCLUSION

Because Thomas did not voluntarily waive his right to remain silent, the trial court should have suppressed his confession.  Accordingly, we reverse his jury convictions and remand for a new trial should the Commonwealth be so advised.  *See* Circuit Court No. FE-2021-37.  The trial court did not abuse its discretion in allowing the Commonwealth's expert testimony.  We affirm Thomas's sentences for the offenses to which he pleaded guilty.  *See* Circuit Court Nos. FE-2020-515 and FE-2021-38.

*Affirmed in part, reversed in part, and remanded.*

Raphael, J., dissenting in part.

I join parts II and III of the majority's analysis, but I respectfully dissent from part I. The majority properly affirms Thomas's convictions for aggravated sexual battery of two young children (a boy and a girl) at the home daycare where Thomas lived. (FE-2020-515, FE-2021-38.) But the majority reverses Thomas's six convictions for rape and other sex crimes against another victim, A.R., committed from the time she was four until she was eight. (FE-2021-37). The trial court concluded that Thomas is a "serial pedophile," sentencing him for the crimes against A.R. to four life sentences plus five years. The sentencing judge found that there was "no way of protecting the community from this man other than to impose a life sentence." The majority now reverses those convictions and vacates the life sentences because it finds that Thomas's *Miranda* waiver was involuntary and that his videotaped confession should have been suppressed. The majority's rationale hinges on the probation officer's saying, after introducing the detectives to Thomas at the start of the interview, "I'm going to be here for a little bit, but just go ahead and chat with them today, okay?"

The majority reaches this surprising result by fashioning what amounts to a per-se rule that if a probation officer is involved in a custodial interrogation, he must tell the probationer that his probation will *not* be jeopardized by invoking his right to remain silent. The majority would require such a disclosure—on top of *Miranda* warnings—even though the majority concedes that the government here did not expressly or implicitly threaten the defendant with the loss of probation if he asserted his privilege against self-incrimination. Because such a supplemental warning is unprecedented and unwarranted, I respectfully dissent.

- 35 -

I. The trial court properly denied the motion to suppress.

### A. *The Invocation Requirement and its two exceptions*

"It has long been settled that the privilege [against self-incrimination] 'generally is not self-executing' and that a witness who desires its protection '"must claim it."'" *Salinas v. Texas*, 570 U.S. 178, 181 (2013) (quoting *Minnesota v. Murphy*, 465 U.S. 420, 425, 427 (1984)). The Supreme Court calls this the "invocation requirement." *Id.* at 183, 186. The defendant must generally invoke his right to remain silent in order to claim its benefit. The invocation requirement applies, for instance, to

> the ordinary witness at a trial or before a grand jury who is subpoenaed, sworn to tell the truth, and obligated to answer on the pain of contempt . . . . The answers of such a witness to questions put to him are not compelled within the meaning of the Fifth Amendment *unless the witness is required to answer over his valid claim of the privilege*.

*Murphy*, 465 U.S. at 427 (emphasis added).

So "in the ordinary case, if a witness under compulsion to testify makes disclosures instead of claiming the privilege, the government has not 'compelled' him to incriminate himself." *Id.* (quoting *Garner v. United States*, 424 U.S. 648, 654 (1976)). "Thus it is that a witness . . . ordinarily must assert the privilege rather than answer if he desires not to incriminate himself." *Id.* at 429. Our appellate courts too have repeatedly recognized the invocation requirement. *See, e.g.*, *Husske v. Commonwealth*, 252 Va. 203, 217 (1996) ("[N]o one required Husske 'to choose between making incriminating statements and jeopardizing his conditional liberty by remaining silent.'" (quoting *Murphy*, 465 U.S. at 436)); *Rivera-Padilla v. Commonwealth*, 55 Va. App. 304, 311 (2009) ("[T]he issue is not whether [the defendant] was compelled to attend the meeting with DSS and answer questions in order to claim benefits, but whether she was coerced to surrender her privilege to claim benefits.").

The United States Supreme Court has recognized exceptions to the invocation requirement when "a witness'[s] failure to invoke the privilege must be excused [because] governmental coercion makes his forfeiture of the privilege involuntary." *Salinas*, 570 U.S. at 184. To date, however, the Court has crafted only "two exceptions." *Id.*

The first exception involves custodial interrogation. "Thus, in *Miranda*, [the Court] said that a suspect who is subjected to the 'inherently compelling pressures' of an unwarned custodial interrogation need not invoke the privilege." *Id.* (quoting *Miranda v. Arizona*, 384 U.S. 436, 467-68 (1966)). "Due to the uniquely coercive nature of custodial interrogation, a suspect in custody cannot be said to have voluntarily forgone the privilege 'unless [he] fails to claim [it] after being suitably warned.'" *Id.* at 184-85 (alterations in original) (quoting *Murphy*, 465 U.S. at 429-30). Proper *Miranda* warnings, however, make all the difference: "the privilege against self-incrimination is self-executing" only as to "*unwarned* statements obtained through custodial interrogation." *United States v. Riley*, 920 F.3d 200, 207 (4th Cir. 2019) (emphasis added).

In other words, once the defendant in a custodial interrogation is properly advised of his rights, the invocation requirement reattaches. To benefit from the privilege, the defendant must then affirmatively invoke it. *Oregon v. Elstad*, 470 U.S. 298, 311 (1985). Indeed, "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. But the burden is on that individual, having been duly warned, to invoke the privilege.

The first exception to the invocation requirement applies here because Thomas was in custody when questioned by the detectives. But as explained below, Detective Carter administered thorough *Miranda* warnings. And courts normally presume that such warnings neutralize the coercion implicit in custodial settings enough to shift back to the defendant the obligation to invoke his Fifth Amendment rights if he wants to remain silent in response to

- 37 -

incriminating questions. *See Elstad*, 470 U.S. at 310-11 ("[A] careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible."). A duly administered *Miranda* warning "conveys the relevant information and thereafter the suspect's choice whether to exercise his privilege to remain silent should ordinarily be viewed as an 'act of free will.'" *Id.* at 311 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)).

A signed *Miranda* waiver, of course, is not dispositive—a "confession, even if obtained in full compliance with *Miranda*, may be inadmissible if it was not voluntary." *Kauffman v. Commonwealth*, 8 Va. App. 400, 405 (1989). "Just as 'no talismanic incantation [is] required to satisfy [*Miranda*'s] strictures,' it would be absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance." *Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (plurality) (quoting *California v. Prysock*, 453 U.S. 355, 359 (1981) (per curiam)).

Still, "'[t]he inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."'" *Id.* (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989)). And "cases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda* are rare." *Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984).

The second exception to the invocation requirement applies when the government coerces the defendant to give up the privilege against self-incrimination by threatening to impose a penalty, like "withdraw[ing] a governmental benefit such as public employment." *Salinas*, 570 U.S. at 185 (citing *Garrity v. New Jersey*, 385 U.S. 493, 497 (1967); *Lefkowitz v. Cunningham*, 431 U.S. 801, 802-04 (1977); and *Lefkowitz v. Turley*, 414 U.S. 70, 84-85 (1973)). Such threats

make the "exercise of the privilege so costly that it need not be affirmatively asserted." *Id.* But "[i]n each of the so-called 'penalty' cases, the state not only compelled an individual to appear and testify, but also sought to induce him to forgo the Fifth Amendment privilege by threatening to impose economic or other sanctions 'capable of forcing the self-incrimination which the Amendment forbids.'" *Murphy*, 465 U.S. at 434 (quoting *Cunningham*, 431 U.S. at 806).

In one of the majority's cases, for instance, the court found that the *Miranda* waiver signed by the juvenile defendant was not voluntary because the detective, before reading the *Miranda* warnings, suggested that if the defendant "remained silent, he would face fabricated charges for things that he did not do." *In re S.W.*, 124 A.3d 89, 103 (D.C. 2015). The court described that scenario as "a 'rare' instance in which . . . a self-incriminating statement was 'compelled' despite the fact that the law enforcement authorities adhered to the dictates of *Miranda*." *Id.* at 92.

As the majority here concedes, neither the probation officer nor the detectives ever threatened Thomas with the loss of probation if he invoked his right to remain silent in response to the detectives' questions. *Ante* at 14 & n.8, 16. So the "penalty" exception to the invocation requirement does not apply.

Beyond these two exceptions, the Supreme Court has been reluctant "to craft . . . new exception[s] to the 'general rule' that a witness must assert the privilege to subsequently benefit from it." *Salinas*, 570 U.S. at 186 (quoting *Murphy*, 465 U.S. at 429). *Salinas*, for example, rejected a proposed "third exception to the invocation requirement for cases in which a witness stands mute [during a noncustodial encounter] and thereby declines to give an answer that officials suspect would be incriminating." *Id.* As the Court explained, "So long as police do not deprive a witness of the ability to voluntarily invoke the privilege, there is no Fifth Amendment

- 39 -

violation" by introducing evidence that the defendant stood silent when asked an incriminating question during a noncustodial encounter. *Id.* at 191.

## B. *No exception for probationers in noncustodial settings*

In *Murphy*, the Court rejected another proposed exception to the invocation requirement, urged by a probationer in a noncustodial setting who failed to invoke the privilege when questioned by his probation officer. 465 U.S. at 440. Although Murphy was not in custody, he had to "be truthful with the probation officer 'in all matters.'" *Id.* at 422. The Court made clear that "the nature of probation is such that probationers should expect to be questioned on a wide range of topics relating to their past criminality." *Id.* at 432.

But *Murphy* also made clear that a probationer's duty to be truthful with his probation officer did not excuse him from having to invoke the privilege when questioned about things that would incriminate him. *Id.* at 440. It makes no difference whether "the probation officer consciously [seeks] incriminating evidence." *Id.* at 431. "[P]olice officers questioning persons suspected of crimes *often* consciously seek incriminating statements," and "the probation officer's knowledge and intent [has] no bearing" on whether the probationer must invoke the privilege. *Id.* (emphasis added). The pressure that Murphy felt to speak with his probation officer was "indistinguishable from that felt by any witness who is required to appear and give testimony." *Id.* at 437. The probationer, no less than the compelled witness, must "exercise the privilege in a timely manner." *Id.* As a result, the government "may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege." *Id.* at 435.

To be sure, *Murphy* does not control the outcome here because Thomas was in custody when questioned; Murphy was not. Footnote five of *Murphy* reserved deciding whether the invocation requirement would apply to a defendant "interviewed by his probation officer while

being held in police custody or by the police themselves in a custodial setting." *Id.* at 429 n.5. But the majority here is wrong to think that footnote five renders everything else in *Murphy* irrelevant. I would hold that the invocation requirement recognized in *Murphy* applies equally to a probationer in a custodial setting, provided he is given proper *Miranda* warnings, is not coerced into confessing, and is not expressly or implicitly threatened with probation revocation for exercising his privilege against self-incrimination.

### C. *Cases involving coercive threats to revoke probation*

Whether or not the defendant is in custody, his confession is involuntary if obtained by threat of probation revocation for exercising his privilege against self-incrimination. As *Murphy* put it, "if the state, either expressly or by implication, asserts that invocation of the privilege would lead to revocation of probation, it would . . . create[] the classic penalty situation, the failure to assert the privilege would be excused, and the probationer's answers would be deemed compelled and inadmissible in a criminal prosecution." *Id.* at 435.

That is precisely what happened in two of the principal cases that the majority relies on. In *State v. Eccles*, 877 P.2d 799 (Ariz. 1994) (en banc), the Arizona Supreme Court invalidated a condition of probation that required the defendant "to waive his privilege against self-incrimination." *Id.* at 800. The court said that "*Murphy* makes clear that the state cannot make waiver of the privilege against self-incrimination a condition of probation." *Id.* The court ruled that the condition could be permissibly revised, however, to require that the defendant "answer truthfully, any questions [asked by] the probation officer, counselors, polygraph examiners, or any other agent of the Probation Department's treatment programs." *Id.* at 801. "Like the condition at issue in *Murphy*, this sanitized condition would merely proscribe false statements and require defendant to respond to questions that could not incriminate him in future criminal proceedings." *Id.* "[I]t would not prohibit him from validly asserting the privilege

against self-incrimination and would not penalize him for so doing." *Id.* But the court was emphatic that the defendant "must assert the privilege at the appropriate time . . . if he desires not to incriminate himself." *Id.*

The majority's other principal case, *United States v. Saechao*, 418 F.3d 1073 (9th Cir. 2005), also involved a "classic penalty situation." *Id.* at 1075. *Saechao* held that a defendant's confession to his Oregon probation officer of a federal firearms offense was properly suppressed because a condition of his probation required "him to 'promptly and truthfully answer all reasonable inquiries' from the officer or face revocation of his probation." *Id.* The Ninth Circuit distinguished that probation condition from the one in *Murphy*. Murphy's condition required him "only to 'be truthful with his probation officers in all matters,' and did not impose any affirmative obligation to respond to his probation officer's questions: 'On its face, [the] probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions . . . .'" *Id.* at 1078 (quoting *Murphy*, 465 U.S. at 436). The Oregon probation condition was problematic, the Ninth Circuit explained, because Oregon law allowed the State to revoke the defendant's probation for refusing to answer questions that would incriminate him in separate criminal proceedings. *Id.* at 1079-80. In *Murphy*, by contrast, Minnesota had "represented that it could not (and would not) have revoked the defendant's probation had the probationer invoked the Fifth Amendment." *Id.* at 1080 n.5.

Echoing the Supreme Court in *Murphy*, the Fourth Circuit recently rejected a challenge to a federal condition of release that, like Thomas's, required the defendant "to truthfully answer questions from his probation officer." *United States v. Linville*, 60 F.4th 890, 893 (4th Cir. 2023). The court explained that the requirement to truthfully answer questions did "not actually require a choice between revocation and asserting the privilege." *Id.* It did "not expressly state that if [Linville] exercised his Fifth Amendment right to remain silent, he risked criminal

- 42 -

penalty." *Id.*  And "Linville had no reasonable basis for believing that he risked revocation of his supervised release if he invoked the Fifth Amendment." *Id.*  "[A]s *Murphy* emphasized, '[Supreme Court] decisions have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege.'" *Id.* at 898 (second alteration in original) (quoting *Murphy*, 465 U.S. at 438).

The Fourth Circuit found *Saechao* unpersuasive because Oregon law permitted a defendant's probation to be revoked for invoking the privilege against self-incrimination.  *Id.* at 898-99.  "Unlike the Oregon law from *Saechao*, clear federal law provides that invoking the Fifth Amendment could not constitutionally be grounds for revoking supervised release." *Id.* at 898.

Thomas's probationary conditions resemble those in *Murphy* and *Linville*.  Thomas was required to "report to [his] probation officer, be truthful, cooperative and report as instructed," and to "follow" his probation officer's instructions.  As in *Murphy*, Thomas's probation conditions "proscribed only false statements; [they] said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Murphy*, 465 U.S. at 437.  So the probation condition here did "not actually require a choice between revocation and asserting the privilege." *Linville*, 60 F.4th at 897.

Indeed, neither Thomas nor the majority cites any authority to suggest that Thomas's probation could be revoked if he chose to invoke the privilege in response to questions from his probation officer or the detectives.  We explained nearly two decades ago that decisions of the United States Supreme Court "'have made clear that the State could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege,' for, in doing so, the government would be imposing a penalty upon an individual who 'elects to

- 43 -

exercise his Fifth Amendment right.'" *Venable v. Commonwealth*, 48 Va. App. 380, 387 (2006) (first quoting *Murphy*, 465 U.S. at 438; and then quoting *Cunningham*, 431 U.S. at 805).

### D. The majority's implicit new exception to the Invocation Rule

The majority agrees "that the record here, including the trial court's subsidiary factual findings, does not present a 'classic penalty situation.'" *Ante* at 14. So the majority concedes that nothing said by the probation officer or the detectives, "either expressly or by implication, assert[ed] that [Thomas's] invocation of the privilege would lead to revocation of probation." *Id.* at 14 n.8 (quoting *Murphy*, 465 U.S. at 435). Upon that premise, the majority insists it is creating "[n]o new per-se rule" establishing an exception to the invocation requirement when a probation officer is involved in a custodial interrogation. *Id.* at 19. Instead, the majority says that it is simply considering the probation officer's request that Thomas speak with the detectives "as a relevant circumstance to be considered as one factor in the voluntariness analysis." *Id.* at 20 (quoting *People v. Stewart*, No. 162497, 2023 WL 4874412, at *10 (Mich. July 31, 2023)). The majority also downplays the significance of this case, characterizing it as an outlier involving "unique" circumstances. *Id.* at 15, 26.

The majority's assurance that it does not view this case as a "classic penalty situation" is difficult to square with its reliance on *Eccles* and *Saechao*, cases that *did* involve threats to revoke the defendant's probation if he invoked the privilege. It is also difficult to see how, under the majority's logic, law-enforcement officers could *ever* involve a probation officer in a custodial interrogation without being required to give special warnings going beyond *Miranda*.

Although the majority denies imposing such a per-se warning requirement, its opinion repeatedly implies that the probation officer or the detectives here *had* to tell Thomas that he could invoke his Fifth Amendment privilege without jeopardizing his probation. The majority says, for instance, that

- 44 -

- the detectives failed to "provide any assurance" to Thomas "that no penalty would be exacted if he disregarded Samluk's instruction to 'chat with'" them;

- *Miranda* warnings alone were insufficient because they did not "clarify" that the probation officer's request for Thomas to speak with the detectives "had no bearing on Thomas's right to remain silent";

- neither the probation officer nor the detectives "clarified that Thomas would *not* suffer any adverse probationary consequences" if he invoked the privilege; and

- despite the *Miranda* waiver signed by Thomas, "the officers provided no additional procedural safeguards to cure [the] problem" that the majority says was caused by the probation officer's asking Thomas to chat with the detectives.

*Ante* at 18, 21.

The majority wrongly suggests that such mandatory disclosures in a custodial setting—on top of standard *Miranda* warnings—are required by the Supreme Court's decision in *Seibert*, 542 U.S. at 600. *Id.* at 18, 20-21. They're not. "*Seibert* provides a narrow exception to the general rule" that *Miranda* warnings suffice to inform a suspect of his constitutional rights. *Keepers v. Commonwealth*, 72 Va. App. 17, 38 (2020). Although no single opinion in *Seibert* commanded a majority, the Court invalidated a confession obtained by police who deliberately circumvented *Miranda* by using the two-step, question-first method of interrogation. *Seibert*, 542 U.S. at 604-05 (plurality). Police first obtained a confession from an un-*Mirandized* defendant in custody, then administered *Miranda* warnings, and then obtained the same confession again for use in court. *Id.* "The object of question-first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611. "What is worse, telling a suspect that 'anything you say can and will be used against you,' without expressly excepting the statement just given, could lead to an entirely reasonable

inference that what he has just said will be used, with subsequent silence being of no avail." *Id.* at 613.

Justice Kennedy concurred in the judgment in *Seibert* on the narrowest grounds, *see id.* at 618-22, so "his concurring opinion . . . provides the controlling law," *Secret v. Commonwealth*, 296 Va. 204, 222 (2018) (quoting *United States v. Street*, 472 F.3d 1298, 1313 (11th Cir. 2006)). "Under Justice Kennedy's subjective-intent based test, in such cases where 'an interrogator uses this deliberate, two-step strategy, predicated upon violating *Miranda* during an extended interview, postwarning statements that are related to the substance of prewarning statements must be excluded absent specific, curative steps.'" *Id.* at 223 (quoting *Seibert*, 542 U.S. at 621 (Kennedy, J., concurring in the judgment)). But Justice Kennedy made clear that this test applies "*only* in the *infrequent case* . . . in which the two-step interrogation technique [is] used in a calculated way to undermine the *Miranda* warning." *Seibert*, 542 U.S. at 622 (emphases added).

*Seibert* is not on point because this case does not involve the two-step interrogation technique condemned there. But even if we were to read *Seibert* expansively to condemn all police tactics intended to coerce a *Miranda* waiver, that case would not help the majority. For the facts here fail to show that anyone intended to trick Thomas into waiving his Fifth Amendment rights.

Judge Bernhard specifically found that the probation officer introduced the detectives to Thomas because "he was just being helpful and courteous." The court further found that the probation officer's statement to Thomas to "chat with them today" did *not* amount to a directive. The probation officer did not say, "Answer all their questions truthfully . . . 'or else,' in so many words, using the power of probation." When asked if he had introduced the detectives to Thomas in order to "trick" Thomas into confessing, the probation officer testified,

- 46 -

unequivocally, "absolutely not." Judge Bernhard found, instead, that the officers were "trying to make the accused feel at ease, and he appeared at ease."

Those subsidiary factual findings, amply supported by the record, preclude requiring a *Seibert*-like warning. Such subsidiary factual findings "are entitled to a presumption of correctness." *Secret*, 296 Va. at 225 (quoting *Midkiff v. Commonwealth*, 250 Va. 262, 268 (1995)). They cannot be set aside unless "plainly wrong or without evidence to support [them]." *Id.* at 226 (alteration in original) (quoting *DeMille v. Commonwealth*, 283 Va. 316, 323 (2012)). Subsidiary factual findings include whether the trial court found the absence of "coercion" during the interrogation, *id.* at 226, and whether law-enforcement officers acted deliberately to circumvent *Miranda*, *id.* at 223-24.

To sum up, when the government does not expressly or implicitly threaten the defendant with probation revocation for invoking his Fifth Amendment rights, the traditional invocation requirement applies as stated in *Murphy* and *Salinas*. There is no reason *not* to apply that rule in a custodial setting when, as here, law-enforcement officers have properly advised the defendant of his constitutional rights. Properly administered *Miranda* warnings will normally suffice to apprise such defendants of the privilege against self-incrimination. It is then up to the defendant whether to invoke his right to remain silent in response to questions that could incriminate him.

### E. *Thomas's voluntary* Miranda *waiver*

I would resolve this case by applying the traditional standard to determine the voluntariness of Thomas's *Miranda* waiver. The trial court must consider whether, under "the totality of the circumstances, the free will of the suspect was overborne." *Thomas v. Commonwealth*, 72 Va. App. 560, 580 (2020). In doing so, "the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." *Secret*, 296 Va. at 220 (quoting *Elstad*, 470 U.S.

at 318). Voluntariness is a question of law that we review do novo on appeal. *Id.* at 225. But subsidiary factual determinations by the trial court are presumed correct and will not be set aside unless plainly wrong or without evidence to support them. *Id.* "The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative." *Id.* at 220 (quoting *Elstad*, 470 U.S. at 318).

Applying that traditional standard, I conclude that Thomas's will was not overborne and that the waiver of his Fifth Amendment rights and his confession were voluntary. To start, I note that Thomas followed along as Detective Carter read him the *Miranda* warnings, printed on the "Warning and Consent" form. The trial judge too "thought the most important [evidence] was where [Thomas] is given his *Miranda* Rights." Carter *twice* said he was investigating Thomas for "Sexual Assault." And Thomas showed that he knew what that meant: he tilted his head left and right before tilting forward and resting his head in the palm of his hand for several seconds, crestfallen.

Detective Carter then carefully reviewed with Thomas each *Miranda* warning. Carter read the first warning aloud: "I have the right to remain silent. I am not required to say anything to anyone at any time or to answer any questions." Carter paused and asked Thomas, "Does that one make sense?" Carter nodded his head in the affirmative. Next, Carter read aloud, "Anything I do or say can and will be used against me in a court of law." Carter asked Thomas, "Understand?" Thomas again nodded in the affirmative. Carter then added, "if you have questions, please let me know, okay?" And Thomas *again* nodded his head in the affirmative.

Detective Carter next read, "I have the right to talk to a lawyer before being questioned, and I also have the right to have the lawyer with me while being questioned." Carter asked, "Pretty straightforward?" Thomas again nodded his head in the affirmative; he also showed his understanding by saying, "Yeah." True, Thomas did not nod or react after Carter read the fourth

and fifth warnings aloud, elaborating on Thomas's right to counsel.[25]  But after reading all five warnings, Carter asked if "all five" of them "make sense?  They're all pretty straightforward but I always want to doublecheck to make sure."  Thomas responded, "Yeah—I can't believe this is happening again."

Carter then read Thomas the "Consent to Speak" text on the waiver form, where the suspect's signature was requested.  It said, "I know what my rights are.  I am willing to make a statement without a lawyer present.  I understand and I know what I am doing.  No promises or threats have been made to me by anyone."  Carter told Thomas, "You don't have to sign it.  It helps if you do.  But you can still agree to talk to us if you don't want sign it.  So it's up to you.  Do you mind signing right here for me?"  Thomas responded, "Yeah," and he signed the waiver.

The majority errs in minimizing the significance of Thomas's express *Miranda* waiver, claiming that Detective Carter characterized Thomas's signing the form as a "mere formality" and some kind of bureaucratic exercise.  *Ante* at 22, 25.  For one thing, Carter made clear to Thomas that he was not required to sign the waiver.  The video shows that Thomas did so willingly.  For another, binding precedent instructs us that Thomas's "express written and verbal statements of waiver of his rights are strong proof of the validity of his waiver."  *Angel v. Commonwealth*, 281 Va. 248, 259 (2011).

---

[25] Those warnings were:

> 4. If I cannot afford a lawyer, and want one, one will be provided to me.

> 5.  If I want to answer questions now without a lawyer present, I will still have the right to stop answering questions at any time.  I also have the right to stop answering questions at any time if I want to talk to a lawyer.

In fact, we have rejected claims that police "diluted" *Miranda* warnings by downplaying their significance to a suspect, such as when police described the warnings as "just procedural stuff." *Keepers*, 72 Va. App. at 29, 37. What is important here is that Thomas was apprised of his "*Miranda* rights" and told he "was free to refuse to answer any questions and could stop talking any time." *Id.* at 37. He then "signed a pre-printed form listing [his] *Miranda* warnings, and [he] did not express any confusion or hesitation in [his] discussions with police." *Id.* Whether a defendant fails to fully appreciate that it may harm his legal interest to speak with law-enforcement officers, rather than remain silent, "does not affect the validity of his waiver." *Tirado v. Commonwealth*, 296 Va. 15, 29 (2018) (quoting *United States v. Yunis*, 859 F.2d 953, 965 (D.C. Cir. 1988)).

After Thomas voluntarily waived his Fifth Amendment rights, the officers then took a bathroom break, telling Thomas that he could use the bathroom whenever he needed. When the group returned from the first bathroom break, the detectives removed the handcuff securing Thomas's left arm to the table, and they conducted the rest of the interview without restraints.

The video recording matches the testimony of the detectives and the probation officer at the suppression hearing. They never threatened Thomas. The detectives and the probation officer said they did not intend to trick Thomas into speaking with them. The detectives' tones were "[c]onversational," "friendly, professional and respectful."

Judge Bernhard specifically found that the detectives' interrogation "was professionally done." As noted above, the trial court found that the probation officer introduced the detectives to be "helpful and courteous," trying to make Thomas feel "at ease"—not to pressure him into waiving his right to remain silent for fear of having his probation revoked. Judge Bernhard found that Thomas understood "what was going on."

The majority is wrong to hint that the detectives acted malignly because they had "*never*" previously asked a probation officer to introduce them to a suspect for a custodial interrogation. *Ante* at 4, 16. The majority overlooks that the probation officer testified that "these are routine things that we do to help the police." And in any case, the majority cannot point to any custom-and-practice evidence to impugn what the probation officer did here. That gap in the majority's argument contrasts with *Seibert*, which canvassed several sources to show that the two-step, question-first interrogation method had gained "popularity" across the country to evade *Miranda. See Seibert*, 542 U.S. at 609-11 & nn.2-3 (plurality).

Judge Bernhard buttressed his conclusion that Thomas voluntarily waived his rights by finding that Thomas's decision was "partially based on his prior experiences" with law enforcement. As the majority notes, "Thomas had more than a dozen police contacts during the 2012 investigation and at one point provided a voluntary statement after being read his *Miranda* rights." *Ante* at 5. But the majority then draws the wrong inference: that Thomas's "experience with the criminal justice system . . . rendered him *more susceptible*" to government coercion. *Id.* at 24 (emphasis added). Our caselaw shows that the *opposite* inference—drawn by Judge Bernhard—is more appropriate. *See, e.g.*, *Midkiff*, 250 Va. at 269 (finding Midkiff's confession to be voluntary, noting that he was "no stranger to the criminal justice system . . . . It is apparent that Midkiff has experienced several prior police interrogations."); *Washington v. Commonwealth*, 43 Va. App. 291, 304 (2004) (stating that the defendant "was well experienced in dealing with the police, having previously been convicted of three felonies").

The majority overemphasizes that the detectives would have known that Thomas attended an alternative school and "that an earlier police report had described Thomas as 'intellectually disabled.'" *Ante* at 24. In fact, Thomas "graduated 12th grade" and could read and write. The majority's emphasis is also misplaced because our precedents make clear that a

defendant's diminished mental capacity is not enough to show that his waiver of rights was involuntary. *E.g.*, *Terrell v. Commonwealth*, 12 Va. App. 285, 292 (1991) (finding waiver voluntary, despite that defendant had "an IQ between 71 and 75," because he "had experience with the criminal justice system through four previous felony convictions"); *see also Murphy*, 465 U.S. at 433 ("Murphy's regular meetings with his probation officer should have served . . . to insulate him from psychological intimidation that might overbear his desire to claim the privilege.").

In short, the majority opinion fails to fully credit the trial court's subsidiary factual findings. Those findings are not plainly wrong or without evidence to support them. They are amply supported by the interrogation video and the witnesses' testimony at the suppression hearing.

On the ultimate question of voluntariness, Judge Bernhard found that Thomas voluntarily waived his privilege against self-incrimination after being informed of his right to remain silent:

> [I]t appeared that based on his—partially based on his prior experiences, on his demeanor, that he knew full well what was going on and that he made [a] voluntary choice to waive his right against self-incrimination after he was advised that he didn't need to speak to the police and that it wouldn't be held against him . . . .
>
> And maybe there was an element there that . . . the officers were very professional, they were kind to him, they got him food, they got him at ease, and he took the occasion to kind of pour his heart out and maybe take responsibility for things that he indicated he had done . . . .
>
> But under the totality of the circumstances, I find that his *Miranda* waiver was voluntary, knowing and intelligent . . . .

Upon de novo review, *Secret*, 296 Va. at 225, I agree that Thomas's *Miranda* waiver was voluntary, knowing, and intelligent.

The probation officer's statement that Thomas should "just go ahead and chat with" the detectives did not threaten the revocation of his probation for invoking the privilege against

self-incrimination. The probation officer made "no suggestion that [Thomas's] probation was conditional on his waiving his Fifth Amendment privilege." *Murphy*, 465 U.S. at 437. Nor is there any evidence that Thomas confessed "because he feared that his probation would be revoked if he remained silent." *Id*.

"'The inquiry is simply whether the warnings reasonably "conve[y] to [a suspect] his rights as required by *Miranda*."'" *Seibert*, 542 U.S. at 611 (plurality) (quoting *Eagan*, 492 U.S. at 203). Here, the detectives' very careful *Miranda* warnings did just that. And even assuming for argument's sake that Thomas "harbor[ed] a [subjective] belief that his probation might be revoked for exercising the Fifth Amendment privilege"—something not supported by anything in this record—"that belief would not have been reasonable." *Murphy*, 465 U.S. at 438. For the Supreme Court has made clear that "the State [cannot] constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege." *Id.*; *Linville*, 60 F.4th at 898 (same); *Venable*, 48 Va. App. at 387 (same).

In sum, Thomas's motion to suppress his confession was properly denied.

II. The trial court properly excluded the testimony of Thomas's mother.

Because the Court reverses Thomas's six convictions for crimes against A.R., remanding those counts for a new trial should the Commonwealth be so advised, the majority does not reach Thomas's first assignment of error. *Ante* at 26-27 n.19. Thomas argues that the trial court erred by excluding testimony from his mother during the guilt phase of the case. Because I would affirm the convictions, I address that argument here.[26]

---

[26] The majority also does not reach Thomas's challenge to the sentence imposed on the convictions involving A.R. *Ante* at 32 n.24. But I would hold, for the same reasons given by the majority in rejecting Thomas's challenges to the other sentences, *id.* at 32-33, that the trial court did not err in sentencing Thomas for his crimes against A.R. Thomas does not dispute that the four life sentences (imposed on two counts of rape and two counts of animate-object penetration) were permitted under Code §§ 18.2-61 and 18.2-67.2. *See Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) ("[W]hen a statute prescribes a maximum imprisonment penalty and the

The defense proposed calling Thomas's mother, Jacqueline Thomas Black, to testify about Thomas's slow development and diminished intellectual functioning. In support of the proffer, the trial judge permitted defense counsel to question Black outside the presence of the jury. Black described Thomas's slow development from about the "age of one" and the difficulties he had remembering things into adulthood. Thomas's mother had to lay out his clothes for him. She used "little cards" and a "chart" to remind him to do such things as brush his teeth, put on deodorant, put on socks, and use soap when showering. And when Thomas lived by himself, his friends would sleep in his house, borrow his things, and eat his food.

The Commonwealth moved to exclude Black's testimony, arguing that it was inadmissible mental-condition evidence under Code § 19.2-271.6 and that the defense had failed to provide the required notice of its intent to introduce such evidence. The defense responded that the evidence was not being offered to show that Thomas "did not have the intent required for the offense charged." Code § 19.2-271.6(B). Instead, the evidence was offered to show that Thomas's statements in his confession were entitled to less weight because of his "susceptibility" to questioning and his faulty memory.

Thomas relied on *Crane v. Kentucky*, 476 U.S. 683 (1986), and *Pritchett v. Commonwealth*, 263 Va. 182 (2002). In *Crane*, the Supreme Court held that a defendant has a due-process right to present evidence at trial "about the physical and psychological environment in which the confession was obtained" to show that his confession "was unworthy of belief."

---

sentence does not exceed that maximum, the sentence will not be overturned as being an abuse of discretion." (quoting *Alston v. Commonwealth*, 274 Va. 759, 771-72 (2007))). And Thomas's claim is without merit that the trial court "made no mention of any mitigation, or even that it considered mitigation in fashioning its sentence." Thomas ignores the trial court's statement at sentencing that it had "considered all of the things that [were] presented by both sides." "Barring clear evidence to the contrary, this Court will not presume that a trial court purposefully ignored mitigating factors in blind pursuit of a harsh sentence." *Bassett v. Commonwealth*, 13 Va. App. 580, 584 (1992). Thomas offers no such "clear evidence" here.

476 U.S. at 684, 691. The defendant's right to present such evidence is not affected by the fact that the trial judge determined the confession to be voluntary, nor by the fact that the defendant "marshaled the same evidence earlier in support of an unsuccessful motion to suppress." *Id.* at 689. Applying *Crane*, our Supreme Court held in *Pritchett* that the trial court erred in excluding the testimony of the defendant's two mental-health experts. 263 Va. at 187. The experts would have testified to Pritchett's intellectual disabilities and the "susceptibility" of such persons "to suggestive police interrogation in connection with the defendant's contention that his confession was unreliable." *Id.* at 183.

After hearing Black's testimony, the trial court excluded it as "too speculative to sync up to [Thomas's] confession in 2019."[27] I would find no abuse of discretion in that ruling.

An "accused does not have an unfettered right to offer [evidence] that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." *Taylor v. Illinois*, 484 U.S. 400, 410 (1988). The Constitution permits the exclusion of evidence that is "only marginally relevant" or that "poses an undue risk of . . . confusion of the issues." *Holmes v. South Carolina*, 547 U.S. 319, 326-27 (2006) (quoting *Crane*, 476 U.S. at 689-90). "The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Barnes v. Commonwealth*, 33 Va. App. 619, 626 (2000) (quoting *Crews v. Commonwealth*, 18 Va. App. 115, 118 (1994)).

"'Relevant evidence' means evidence having any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence." Va. R. Evid. 2:401. "Evidence that is not relevant is not admissible." Va. R. Evid. 2:402(a). "Evidence of collateral facts or those incapable of affording any reasonable presumption or inference on

---

[27] Although the trial court excluded Black's testimony in the guilt phase, the defense detailed Thomas's intellectual challenges at sentencing.

matters in issue, because too remote or irrelevant, cannot be accepted in evidence." *McMillan v. Commonwealth*, 277 Va. 11, 22 (2009) (quoting *Smith v. Commonwealth*, 223 Va. 721, 723 (1982)). In other words, "evidence that produces only speculative inferences is irrelevant . . . and should be excluded." 29 Am. Jur. 2d *Evidence* § 295 (2019).

Our opinion in *Barnes* provides a good example of evidence that was properly excluded as too attenuated and speculative. The trial court there barred a defense witness from testifying that Barnes "worked five days a week doing manual labor for minimum wage." 33 Va. App. at 624. Barnes argued that the evidence showed that he "was not a drug dealer," since "a drug dealer who was making $600 per day would not engage in minimum wage work." *Id.* We upheld the witness's exclusion, however, because Barnes "neither proffered nor presented evidence of the relationship between minimum wage employment and drug dealing," thus requiring the factfinder "to speculate as to that relationship." *Id.* at 626. Moreover, the time frame when Barnes worked the minimum wage job ended before the period when he allegedly used an underling to sell drugs. *Id.* So the "proffered testimony" also "concerned facts remote in time." *Id.* at 626-27.

The trial court here likewise did not abuse its discretion in excluding Black's testimony as "too speculative to sync up to [Thomas's] confession in 2019." Black did not describe any instance in which Thomas was encouraged by others to admit to something he did not do. And the defense presented no connection—no "evidence of the relationship," *Barnes*, 33 Va. App. at 626—between Thomas's slow development and forgetfulness, on the one hand, and his being prone to falsely confess to police, on the other. The examples offered by Black about Thomas's behavior in his younger years were also "remote in time," *id.* at 627, to his confession in 2019, when Thomas was 35 years old.

Excluding that testimony did not violate *Crane*. *Crane* entitled Thomas to "introduce testimony about the physical and psychological environment in which the confession was obtained" to show that his incriminating statements were "unworthy of belief." 476 U.S. at 684. But Black's testimony did not address Thomas's confession. The jury would have had to engage in rank speculation to connect Black's testimony about Thomas's developmental issues when younger to his suggestibility or propensity to falsely confess at age 35.

Nor did the trial court's ruling violate *Pritchett*, where the trial court erred by disallowing the testimony of two "experts in the field of psychology." 263 Va. at 185. Their testimony directly addressed the risk of false confessions and was admissible under *Crane* "to assist the jury in determining whether the confession was reliable." *Id.* at 186. One expert, a clinical neuropsychologist, testified that her testing showed that Pritchett had an IQ of 69 and was intellectual disabled. *Id.* at 185. The other, a forensic psychologist, testified that such low IQ's correlate with a tendency to "go along with [authority] figures" and with "leading questions." *Id.* (alteration in original). That expert had also administered a test to Pritchett to confirm his willingness to go along with the questioner. *Id*. at 185-86. Black, by contrast, was not a mental health expert and her testimony did not address Thomas's susceptibility to leading questions, let alone his propensity to admit to things he did not do.

In short, the trial court did not err by excluding Black's testimony.

\* \* \*

There is much in the majority's opinion with which I agree. But the majority commits a grave error by tacking a codicil onto standard *Miranda* warnings for cases involving probationers in custodial settings. This new exception to the invocation requirement finds no support in our caselaw or that of any other jurisdiction. The cost of that error here is to vacate Thomas's four life sentences for his vile crimes against A.R. That is bad enough. What is worse—and

incalculable—is the disruption the majority's stealth rule will inject into future cases in which probation officers have any involvement in custodial interrogations. "*Miranda*'s clarity is one of its strengths . . . ." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). What the majority does today only "undermine[s] that clarity." *Id.*